Exhibit 1

## DISTRIBUTOR APPOINTMENT AGREEMENT

This Distributor Appointment Agreement ("Agreement"), effective as of the date on which the last Party hereto signs this Agreement ("Effective Date"), is by and between **KLX Energy Services LLC**, a Delaware limited liability company, having offices at 3040 Post Oak Blvd, 15th Floor, Houston, TX 77056 ("KLX" or "Distributor"), and **Magnesium Machine, LLC**, an Oklahoma limited liability company having a place of business at 5305 Robert Lee Rd., Duncan, OK 73533 ("Manufacturer"). Distributor and Manufacturer may be referred to herein in the singular as a "Party" and collectively as the "Parties."

**WHEREAS**, Manufacturer develops, exclusively and solely owns, manufactures, and sells the dissolvable Adair frac plug product specifically identified in **Exhibit A** (in various sizes), a copy of which is attached hereto, the contents of which are hereby incorporated in their entirety by reference, as well as any and all improvements and derivatives related thereto (collectively, the "Products"); and

**WHEREAS**, Manufacturer is willing to appoint Distributor as its exclusive distributor to promote and sell the Products in the United States and Canada, and the territorial waters thereof, (the "Territory"), and a non-exclusive appointment to distribute and promote the Products worldwide outside of the Territory, and Distributor accepts such appointment upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, the Parties hereby agree as follows:

ARTICLE 1. - APPOINTMENT OF DISTRIBUTOR

Subject to the terms and conditions set forth in this Agreement, Manufacturer hereby appoints Distributor as its exclusive distributor of the Products in the Territory to market, promote and sell the Products and its non-exclusive distributor worldwide of the Products outside of the Territory, to market, promote and sell the Products. Distributor hereby accepts said appointment upon the terms and conditions hereinafter set forth and agrees to perform its responsibilities diligently and in a thorough and professional manner.

ARTICLE 2 - RESPONSIBILITIES OF DISTRIBUTOR

In consideration of the foregoing appointment, Distributor hereby agrees as follows:

(a)   In accordance with the terms of this Agreement, Distributor shall, in its discretion, actively promote the sale of the Products.

(b)   Distributor agrees to maintain appropriate inventory levels of Products to support customers in the Territory and commits to the quarterly minimum order quantities set forth in **Exhibit B**, a copy of which is attached hereto, the contents of which are incorporated in their entirety herein by reference. Should Distributor fail to order such minimum order quantities within 15 days of the end of any calendar quarter and following written notice from Manufacture providing Distributor with a chance to place a corrective order, this Agreement shall become non-exclusive within the Territory for the duration of the Term (or, if applicable, any Renewal

1

Term(s)) of this Agreement, but all other terms and conditions of this Agreement shall remain in effect, except as specifically noted.

(c) Distributor shall comply in all respects with Legal Requirements (as defined below) applicable to the purchase and sale of the Products and to the operation of its business. For the purposes of this Agreement, the term "Legal Requirement" shall mean any applicable federal, state, local or foreign law, statute, standard, ordinance, code, order, rule, regulation, resolution, promulgation, or any order, judgment or decree of any court of competent jurisdiction, arbitrator, tribunal or governmental authority, or any applicable license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force and effect of law.

ARTICLE 3 - OBLIGATIONS OF MANUFACTURER

Manufacturer hereby agrees as follows:

(a) Manufacturer shall sell Products to Distributor in accordance with the terms of this Agreement.

(b) Manufacturer shall refer any potential customer who inquires about the purchase of the Products in the Territory to the Distributor, unless this Agreement becomes non-exclusive as detailed in Article 2(b).

(c) Manufacturer shall provide Distributor with Product pricing and payment terms as set forth in **Exhibit B**.

(d) If available, Manufacturer shall provide reasonable quantities, as determined in Manufacturer's sole discretion, of available sales promotional material, literature, brochures, printed catalogs and technical materials used to promote the Products. Manufacturer shall keep Distributor informed of improvements, derivatives, and new revisions to the Products and any promotions or service issues.

(e) Manufacturer shall and does hereby assign Distributor the highest restocking priority.

ARTICLE 4 - SALES OF PRODUCTS TO DISTRIBUTOR

Manufacturer shall sell Products to Distributor, and Distributor shall purchase Products from Manufacturer, in accordance with the following terms and conditions:

(a) Products sold to Distributor shall be shipped F.O.B. Manufacturer's manufacturing plant, at which point title to and risk of loss of the Products shipped shall pass from Manufacturer to Distributor.

(b) Manufacturer shall accept and fill each order from Distributor (each such order, a "Purchase Order").

(c)   All Products purchased from Manufacturer shall be purchased by Distributor for resale for its own account and Distributor shall have full responsibility for invoicing its customers, collecting all accounts receivable and bearing all credit risks relating to such accounts. The prices and terms and conditions of sale regarding Distributor's resale of Products to its own customers shall be exclusively under the control of Distributor, and Manufacturer shall have no right to control, nor shall it attempt to control, such prices or terms and conditions of resale.

ARTICLE 5 - WARRANTY

All Products sold by Manufacturer hereunder are subject to Manufacturer's written warranty as in effect at the time of sale. Manufacturer's liability to Distributor, or to Distributor's customers, with respect to Products shall be exclusively as provided in such warranty. MANUFACTURER MAKES NO OTHER WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE.

ARTICLE 6 - INDEPENDENT CONTRACTOR

Manufacturer and Distributor shall at all times act as and be independent contractors and neither Party shall have any right or authority to make any representation or warranty on behalf of the other Party, or in any manner assume or create any obligation or responsibility, express or implied, on behalf of or in the name of the other Party, or act for or bind the other Party in any respect whatsoever. Neither Party is an agent, employee, partner or legal representative of the other Party.

ARTICLE 7 - TRADEMARKS

(a)   Subject to the terms of this Agreement, Manufacturer grants to Distributor the non-exclusive and non-transferable right to use Manufacturer's present and future trademarks and trade names, registered or unregistered, of the Products (the "Manufacturer Trademarks") for the purpose of Distributor's promotion and sale of the Products in and outside of the Territory. Distributor agrees the Distributor's right to use the Manufacturer Trademarks shall terminate upon the termination of this Agreement, provided that Distributor shall be able to use the Manufacturer Trademarks for the sole purpose of selling the Products for so long as it maintains stock in the Products after the termination of this Agreement. Notwithstanding anything herein to the contrary, Manufacturer authorizes Distributor to rebrand the Products using its own present and future trademarks and trade names.

(b)   <u>Distributor's Acknowledgment and Compliance with Manufacturer's Specifications and with Laws</u>. Distributor acknowledges and is familiar with the high standards, quality, style, and image of Manufacturer, and Distributor shall, at all times, conduct its business and use the Manufacturer Trademarks regarding the Products in a manner consistent with these standards, quality, style, and image. Distributor shall comply with the specifications, standards, and directions relating to the Products. In exercising its rights under this Agreement, Distributor shall comply with all applicable Laws.

(c)     Notification. Distributor shall immediately notify Manufacturer giving reasonable detail, if any, should the following matters come to its attention: (i) any actual, suspected, or threatened infringement of the Manufacturer Trademarks; (ii) any actual, suspected, or threatened claim that any of the Manufacturer Trademarks are invalid; (iii) any actual, suspected, or threatened opposition to the Manufacturer Trademarks; (iv) any actual, suspected, or threatened claim that use of the Manufacturer Trademarks infringes the rights of any third party; (v) any person applies for, or is granted, a registered trademark by reason of which that person may be, or has been, granted rights which conflict with any of the rights granted to Licensee under this Agreement; or (vi) any other actual, suspected, or threatened claim to which the Manufacturer Trademarks may be subject.

(d)     Actions. With respect to any of the matters listed in Article 7(c), (i) Manufacturer shall decide, in its sole discretion, what action if any to take; (ii) Manufacturer shall have exclusive control over, and conduct of, all claims and proceedings; and (iii) Distributor shall provide Manufacturer, at Manufacturer's sole cost and expense, with all assistance that Manufacturer may reasonably require in the conduct of any claims or proceedings.

## ARTICLE 8 - PATENTS AND PATENT INFRINGEMENT

(a)     Nothing in this Agreement shall convey to Distributor any right or license under any present or future patent owned, controlled, or licensed by Manufacturer. Distributor shall notify Manufacturer promptly in the event it becomes aware of any imitation of any Product or infringement of any of Manufacturer's patents within the Territory.

(b)     Manufacturer shall defend, indemnify, and hold harmless Distributor from and against all losses, damages, liabilities, deficiencies, actions, final judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and expenses, or other costs of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively defined as "Losses") arising from any claim, action or lawsuit alleging infringement of any patent, trademark, and/or intellectual property right in connection with any Product provided to Distributor by Manufacturer hereunder; *provided, however,* that Manufacturer shall have no obligation under this Article 8(b) with respect to claims to the extent arising out of:

     (i)     any materials of Distributor (including Proprietary Information of Distributor) or any instruction, information, designs, specifications, or other materials provided by Distributor to Manufacturer; or

     (ii)     use of the Products in combination with any materials or equipment not supplied to Distributor by Manufacturer or specified by Manufacturer in writing, if the infringement would have been avoided by the use of the Products not so combined; or

     (iii)     any modifications or changes made to the Products by or on behalf of any person or party other than Manufacturer or its representatives.

(c)      If Distributor is unable to distribute Products due to infringement of any patent, trademark, and/or intellectual property right in connection with any Product provided to Distributor by Manufacturer hereunder, Manufacturer agrees to repurchase effected Product at Distributor's cost.

ARTICLE 9 - FORCE MAJEURE

Neither Party shall be liable for any non-performance or delay in performance, to the extent that such non-performance or delay in performance is caused by circumstances beyond the reasonable control of the Party affected, including, without limitation, acts of God, fires, floods, wars, sabotage, civil unrest, accidents, labor disputes, governmental laws, ordinances, rules and regulations, whether valid or invalid (including, without limitation, priorities, requisitions, allocation and price adjustment restrictions), inability to obtain equipment or transportation ordinarily available to and used by the affected Party. If, due to any such circumstance, Manufacturer is unable to supply all of the Products ordered by Distributor, the quarterly minimum order quantity requirements set forth in this Agreement shall not apply for the duration of such force majeure event. Manufacturer shall provide written notice as soon as practicable to Distributor and Manufacturer shall allocate priority for the sale of Products to meet Distributor's requirements.

ARTICLE 10 - EXPORT REGULATIONS

This Agreement is subject to all applicable United States laws and regulations related to exports and to all administrative acts of the U.S. Government pursuant to such laws and regulations. Each Party hereby agrees that it shall comply with the export control laws and regulations, embargoes and sanctions. Each Party agrees that in the event that export controlled information/technology is disclosed, the disclosing Party shall provide the receiving Party with sufficient and appropriate information including Export Control Classification Numbers (ECCNs) and/or the Munitions List categories to allow the receiving Party to properly comply with the export controls regulations. Manufacturer maintains an export management system adequate to ensure compliance.

ARTICLE 11 - DURATION AND TERMINATION.

(a)      This Agreement shall be effective upon the Effective Date, and, unless sooner terminated in accordance with the provisions herein, shall remain in effect for a period of three (3) years (the "Term"). Manufacturer grants Distributor two (2) options to extend the Term of this Agreement for an additional period of three (3) years each upon the same terms and conditions as stated in this Agreement (each a "Renewal Term(s)"). Manufacturer and Distributor agree that the options to extend for subsequent Renewal Terms must be exercised by written notice from Distributor to Manufacturer at least ninety (90) days before the expiration of the initial Term or applicable Renewal Term of this Agreement then in effect.

(b)      Except as set forth in Article 2(b) with regard to Distributor's commitment to purchase quarterly minimum order quantities which sets forth the sole consequence for Distributor's failure to meet such commitments, if at any time either Party shall be in material default hereunder and shall fail to remedy such material default to the reasonable satisfaction of

the non-defaulting Party within thirty (30) days following notice from the non-defaulting Party specifying such default, the non-defaulting Party may terminate this Agreement by written notice of termination to the defaulting Party within ten (10) days following the said thirty (30) days. Either Party may terminate this Agreement immediately upon written notice if the other Party (i) becomes insolvent; (ii) files a voluntary petition in bankruptcy; (iii) executes an assignment for the benefit of creditors; (iv) is adjudicated bankrupt or insolvent or a receiver or trustee is appointed for that Party; or (v) the other Party terminates its existence or ceases to do business. Unless otherwise mutually agreed in writing, any termination of this Agreement shall operate as a cancellation of the entire undelivered or unperformed portions of any Purchase Orders placed hereunder by Distributor and accepted by Manufacturer prior to the effective date of such termination.

ARTICLE 12 - RIGHTS AND OBLIGATIONS UPON EXPIRATION OR TERMINATION

Upon expiration or termination of this Agreement, whichever is earlier:

(a) Distributor shall cease to be an authorized distributor of the Products and shall cease representing itself to be a distributor of the Products provided, however, Distributor may continue the sale of any Products remaining in Distributor's inventory.

(b) Distributor shall promptly pay to Manufacturer all sums owing to Manufacturer, without deduction or set-off of any kind or nature.

ARTICLE 13 - CONFIDENTIALITY.

(a) During the course of the Manufacturer providing Products to Distributor for Distributor's promotion and sale of such Products within and outside the Territory (the "Purpose"), the Parties hereby recognize that each may be exposed to unpublished items of technical or non-technical information including, but not limited to, materials, equipment, designs, specifications, know-how, product uses, processes, blueprints, formulae, costs, financial data, marketing plans and direct selling systems, customer lists and technical and commercial information relating to customers or business projections used by either Party in its business, and any other documents or information that either Party considers to be trade secrets or confidential information (collectively, "Proprietary Information"), whether or not the subject of any patent or patent application, constitute valuable trade secrets or confidential information and are the exclusive property of the Party disclosing such information. Consequently, during the Term of this Agreement (or, if applicable, any Renewal Term(s)) and for a period of five (5) years thereafter, neither Party shall disclose to any unauthorized person or use in any unauthorized manner the Proprietary Information, and each Party specifically further agrees:

(i) not to, directly or indirectly, disclose or make available to anyone not employed by or affiliated with such Party, or use outside of such Party's organization, any Proprietary Information for any reason or purpose whatsoever unless such persons: (1) have been duly informed of the obligations of confidentiality associated with the Proprietary Information; (2) expressly agree, in writing, to comply with the

        obligations of confidentiality associated with such Proprietary Information, such obligations being as least as restrictive as the obligations set forth in this Agreement; and (3) have an express need to know such information in order to accomplish the Purpose.

    (ii)    to take any and all actions to safeguard all Proprietary Information at all times so that such Proprietary Information is not exposed to, or taken by, unauthorized persons; and

    (iii)    in the event of termination of this Agreement for any reason, to return to the disclosing Party, and refrain from any further use thereafter in any manner, all of the disclosing Party's property, including personal notes and reproductions, documents and other information relating to the disclosing Party's business and Proprietary Information in the receiving Party's possession or control; provided that if return of Proprietary Information is not practicable, the Party receiving the Proprietary Information shall destroy the Proprietary Information. The receiving Party may keep one (1) copy of the Proprietary Information in order to comply with applicable laws and audit requirements and shall safeguard such copy to the extent required by this Section 13.

(b)    The foregoing obligations of confidentiality shall not apply with respect to Proprietary Information to the extent that the receiving Party can document that such information is within the public domain through no fault of the receiving Party; or available to the receiving Party from third parties who in making such disclosure breached no confidentiality relationship; or is in a written record in the receiving Party's files prior to its receipt from the disclosing Party; or if such information is disclosed with the prior written consent of the disclosing Party; or if disclosure is required by applicable law(s), federal and/or state regulation(s), and/or valid court order.

(c)    <u>Notice Regarding Permissible Disclosure of Trade Secrets</u>. Pursuant to the Defend Trade Secrets Acts, an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

## ARTICLE 14 - INSURANCE

Manufacturer represents and warrants that it now maintains and shall continue to maintain comprehensive general liability insurance with solvent and reputable carriers, including, but not

limited to, product liability insurance, and any other insurance customary in the industry. Manufacturer's commercial general liability insurance shall provide coverage for, but not limited to, the following: product liability coverage; broad form contractual liability coverage; and coverage for potential litigation costs. Upon written request from Distributor, Manufacturer shall promptly furnish Distributor with a certificate of insurance issued by the relevant carrier(s) establishing that such insurance is in effect. Such insurance shall not be canceled or modified on less than thirty (30) days prior written notice to Distributor.

ARTICLE 15 - NOTICES

Notices permitted or required to be given hereunder shall be deemed sufficient, as of the earliest to occur of the following methods of delivery, if given by: (i) hand; (ii) registered or certified mail, postage prepaid, return receipt requested; or (iii) recognized overnight courier service (i.e. FedEx, UPS, or DHL). Such notice shall be effective upon the earliest of: (a) receipt by the Party to which notice is given, as evidenced by personal delivery acknowledgement; (b) courier delivery confirmation; or (c) the fifth (5th) business day following the date such notice was posted. Notices shall be addressed to the following respective addresses of the Parties, or such other addresses as the Parties may designate by notice from time to time:

> If to Distributor, addressed to:
> KLX Energy Services LLC
> 3040 Post Oak Blvd., 15th Floor
> Houston, TX 77056
> Attn: Law Dept.
>
> If to Manufacturer, addressed to:
> Magnesium Machine, LLC
> 5215 Robert Lee Rd.
> Duncan, OK 73533
> Attn: Loren Swor

ARTICLE 16 - LIMITATION OF LIABILITY

Neither Party shall be liable to the other for any punitive, exemplary, special, indirect, incidental or consequential damages including any loss of profit or business interruptions or loss or delay of production, regardless of whether such damages are reasonably foreseeable arising from (a) the sale of the Products or (b) any breach of the terms and conditions of this Agreement, any sales order, Purchase Order or agreement for the sale of Products as contemplated herein.

ARTICLE 17 – DISTRIBUTOR'S RIGHT OF FIRST REFUSAL

In the event that Manufacturer receives an offer to sell its business, substantially all of its assets, or a majority of its equity interests, Distributor shall have a continuing right of first refusal throughout the Term of this Agreement (or, if applicable, any Renewal Term(s)) to acquire (a) one-hundred percent, or a majority, of Manufacturer's equity interests, or (b) that portion of Manufacturer's assets as used in connection with production of the Products, provided that such acquisition shall

be on commercially reasonable terms (including, without limitation, any applicable financial terms) no less favorable than those offered by and received from the offering third party. If at any time during the Term of this Agreement (or, if applicable, any Renewal Term(s)) a third party makes a bona fide offer to acquire Manufacturer's business, substantially all of its assets, or a majority of its equity interests, Manufacturer shall, within ten (10) days following such third party offer, provide Distributor with prompt written notice, which notice shall confidentially include the substantive details of such third party offer. Within ten (10) days following the receipt of the details of such third party offer, Distributor shall notify the Manufacturer in writing whether it is electing to exercise its right of first refusal in accordance with the provisions set forth in this Article 17. If Distributor fails to reply within such ten (10) day period, or notifies Manufacturer that it does not wish to exercise its right of first refusal pursuant to this Article 17, Manufacturer shall be free to move forward with the business transaction(s) with such third party(-ies) with no additional obligations to Distributor.

ARTICLE 18 – MISCELLANEOUS PROVISIONS

(a) This Agreement sets forth the entire Agreement and understanding between the Parties as to the subject matter hereof and supersedes all prior discussions between them, whether written or oral, and neither of the Parties shall be bound by conditions, definitions, warranties, or representations other than as expressly provided in this Agreement or subsequent amendment(s) hereto.

(b) No amendment, modification, or waiver of this Agreement, or any of the provisions herein contained, shall be effective unless in writing and agreed to by duly authorized representatives of each of the Parties.

(c) Neither Party may assign this Agreement, without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed; provided, that upon prior written notice to the other Party, either Party may assign this Agreement to an affiliate(s) of such Party or to a successor of all or substantially all of the assets of such Party through merger, reorganization, consolidation, or acquisition. No assignment shall relieve the assigning Party of any of its obligations hereunder. Any attempted assignment, transfer, or other conveyance in violation of the foregoing shall be null and void. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

(d) If any term, provision, covenant, and/or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, and/or unenforceable, the remainder of the terms, provisions, covenants, and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated, and each such term, provision, covenant, or restriction that is held invalid, illegal, or unenforceable shall be construed by limiting it so as to be valid, legal, and enforceable to the maximum extent permitted by applicable law.

(e) The failure of either Party to insist, in any one or more instances, upon the performance by the other Party of any of the terms, conditions, or provisions of this Agreement, or to exercise any right under this Agreement, shall not be construed to be a waiver of the future

performance of any such term, condition, or provision or the future exercise of such right, but the obligations of each Party with respect to such future performance shall continue in full force and effect.

(f) The following Articles survive termination or expiration of this Agreement: (8) Patents and Patent Infringement, (13) Confidentiality, (16) Limitation of Liability, and any other terms of this Agreement which by their nature ought to survive the expiration or termination of this Agreement.

(g) This Agreement may be executed in multiple counterparts. All such counterparts, when so executed, shall be deemed to constitute one final agreement as if one document had been signed by all Parties to this Agreement. Each such counterpart, upon execution and delivery of all counterparts, shall be deemed to be a complete and original of this Agreement. A telecopy or facsimile transmission of a signed counterpart of this Agreement shall be sufficient to bind the Party or Parties whose signature(s) appear thereon.

## ARTICLE 19 - GOVERNING LAW

This Agreement shall be governed by the laws of the State of Oklahoma, without regard to choice of law provisions or to which Party drafted particular provisions of this Agreement. Any legal action in connection with this Agreement shall be filed in a court of competent jurisdiction in the State of Oklahoma, to which jurisdiction and venue the Parties expressly agree.

*[Signature page follows.]*

**IN WITNESS WHEREOF**, the Parties hereto, by the signature below of their authorized representatives, agree to be bound by the provisions of this Agreement as of the date of last signature hereinbelow.

Distributor
KLX Energy Services LLC
By: *[signature]*
Name: Thomas McCaffrey
Title: President
Date: 6/27/2018

Manufacturer
Magnesium Machine, LLC
By: *[signature]* / *[signature]*
Name: Loren Swor / BRIAN WILKINSON
Title: Manager, ManSer / MANAGING MEMBER
Date: 7/12/2018 / 7/12/18

**Exhibit A**
**Dissolvable Adair Frac Plug**
The Product is provided as substantially shown below, and/or substantially as shown below but in additional sizes.



**Exhibit B**
**Product Price, Minimum Order Quantities and Payment Terms**

1) Product Price:
   Product price = ▮▮▮▮t
   For informational purposes only, the current Product(s) as of the Effective Date of this Agreement is the dissolvable Adair frac plug shown in detail in Exhibit A.

2) Minimum Order Quantities:
   - Effective date through June 30, 2018 ▮▮▮
   - Initial Order: Within 10 days of execution of contract (including YTD orders) ▮▮▮
   - July 1, 2018 through September 30, 2018 ▮▮▮
   - October 1, 2018 through December 31, 2018 ▮▮▮
   - Each calendar quarter during the term of this Agreement beginning January 1, 2019 ▮▮▮

   

3) Payment Terms:
   a) Initial Order: 50% down payment within 20 days of order. Balance of payment is due upon receipt of Products and Manufacturer's invoice
   b) Additional Payments are due upon receipt of the Products and Manufacturer's invoice.

4) The Product price will be automatically adjusted for changes in magnesium prices ("Magnesium-based Price Adjustment") and for inflation ("Inflation-based Price Adjustment") as specified in the subparagraphs 4(a) and 4(b) following. Any other changes to Product price must be determined by mutual agreement between the Parties.

   a) Magnesium- based Price Adjustment shall occur based on the following procedure:
   - The price of magnesium on a given date is defined as the average price for the preceding 60 days as cited on metalbulletin.com for "Magnesium min 99.8% Mg, Fob China main ports $ per tonne" ("Price of Magnesium").
   - For each order, the Price of Magnesium shall be assessed on the date the order is received by the Manufacturer.
   - When the Price of Magnesium, on the date an order is received, has increased or decreased by 20% or more since the date of the previous Magnesium-based Price Adjustment, the Manufacturer shall adjust the Product price in the same direction as the change in the Price of Magnesium by a percentage equal to 2/3 of the percentage change in the Price of Magnesium.
   - The baseline Price of Magnesium will be assessed on the Effective Date of this agreement.
   - In the event that data for the specified Price of Magnesium calculation becomes unavailable, the Parties shall choose a similar index reference by mutual agreement.

   b) Inflation-based Price Adjustment shall occur based on the following procedure:

- The rate of Inflation shall be defined as the annual change (not seasonally adjusted) in the June Consumer Price Index for All Urban Consumers (CPI-U) as provided by the US Department of Labor's Bureau of Labor Statistics ("Rate of Inflation").
- The Product price shall be annually adjusted, upon release of the Rate of Inflation, by a percentage change equal to ½ of Rate of Inflation and in the same direction as the Rate of Inflation change.