## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

KLX ENERGY SERVICES LLC

          Plaintiff,

v.

MAGNESIUM MACHINE, LLC AND
CORNERSTONE TOOLS, LLC

          Defendants.

Case No. 5:20-cv-01129-F

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff KLX Energy Services LLC ("KLX" or "Plaintiff") hereby submits this First Amended Complaint against Magnesium Machine, LLC ("Mag Machine") and Cornerstone Tools, LLC ("Cornerstone," together "Defendants") and states as follows:

## SUMMARY OF ACTION

1.    This is an action for breach of contract and misappropriation of trade secrets by which KLX's manufacturing vendor took advantage of KLX's confidential testing and engineering data, customer information, and cost structure to surreptitiously "undercut" and steal KLX's business for itself.

2.    KLX is an oilfield service provider that sells specialized tools to its E&P customers.  Until last year, Defendant Mag Machine was KLX's manufacturing vendor for a line of specialized products known as dissolvable frac plugs.

3.      In 2018, the parties entered a Distribution Agreement pursuant to which KLX obtained the exclusive right to sell a dissolvable frac plug manufactured by Mag Machine.

4.      When the original plug failed to meet its customer's needs, KLX's in-house engineers introduced a number of material changes to the plug design, which were incorporated into Mag Machine's manufacturing process.  Those design changes are the result of KLX's own extensive in-house testing and analysis and represent the fruits of countless trials and errors following KLX's confidential discussions with its customers.

5.      In the performance of the Distribution Agreement, KLX also provided Mag Machine with confidential and proprietary information including the specific identities of its dozens of customers and their operational needs.

6.      Last October, Plaintiff learned that Mag Machine, through its newly created affiliate Cornerstone Tools, has been secretly marketing and selling dissolvable frac plugs to KLX's customers (and potentially others) at a substantial discount, driving business away from KLX.  Defendants are not just selling any plug; instead they are selling the modified plug that incorporates KLX's numerous design enhancements and, in so doing, are exploiting Mag Machine's insider knowledge of KLX's customer lists and cost structure to specifically target KLX's customers and steal away its business.

7.      Defendants' marketing and sale of dissolvable frac plugs to KLX's own customers not only violates Mag Machine's contractual obligations under the distribution agreement, but it also amounts to a misappropriation of KLX's hard-won trade secrets.

8.      To protect its rights and preserve the status quo, KLX seeks preliminary and permanent injunctions ordering Mag Machine and Cornerstone Tools to refrain from marketing and selling dissolvable frac plugs to KLX's customers, and from otherwise improperly using KLX's confidential information and trade secrets.

## PARTIES

9.      Plaintiff KLX Energy Services LLC is a Delaware limited liability company with its principal place of business at 3040 Post Oak Blvd, 15th Floor, Houston, TX 77056.

10.     Defendant Magnesium Machine, LLC is an Oklahoma limited liability company with its principal place of business in Oklahoma.  Mag Machine can be served at 5305 Robert Lee Rd., Duncan, OK 73533 or wherever it may be found.

11.     Defendant Cornerstone Tools, LLC is an Oklahoma limited liability company with its principle place of business in Oklahoma.  Cornerstone can be served through its registered agent, Daniel V. Carsey, at 100 N. Broadway Suite 2900, Oklahoma City, OK 73102 or wherever it may be found.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  Plaintiff is a citizen of Texas, and Defendants are citizens of Oklahoma.

13.     This Court also has subject matter jurisdiction over Plaintiff's federal trade secret claims pursuant to 18 U.S.C. § 1836 *et seq*. and 28 U.S.C. § 1331; this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Defendants because they each have their principal place of business in this judicial district.

15.     In addition, all or a substantial part of the events giving rise to the claims alleged in this Complaint occurred in this judicial district.  Therefore, venue lies in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

## FACTUAL ALLEGATIONS

### I.     KLX and Magnesium Machine Execute the Distribution Agreement

16.     Plaintiff KLX is an oilfield service company based in Houston, Texas.  A large component of KLX's business is providing specialized tools and equipment to its customers engaged in oil and gas exploration and production ("E&P") across the United States.

17.     KLX's business success depends on the performance of its products.  The Company spends extensive time, labor, skill, and money evaluating and making technical improvements to its products to meet the unique needs of its E&P customers.

18.     One of the specialized products KLX sells is dissolvable frac plugs.  These plugs are used by drillers during fracturing ("fracking") operations to temporarily separate pressurized zones within the wellbore.  The plugs are made of dissolving metal and rubber, which adds value to the E&P customer by eliminating the need for conventional plug removal after fracking.

4

19.     KLX's dissolvable frac plugs were manufactured by Defendant Mag Machine pursuant to a "Distributor Appointment Agreement" the parties executed on July 12, 2018.  A true and correct copy of that agreement is attached as **Exhibit 1** (the "Distribution Agreement").[1]

20.     When the parties entered the Distribution Agreement, they had agreed on an initial "prototype" of a plug design that Mag Machine referred to as the "Adair" frac plug.  The Distribution Agreement grants KLX the exclusive right to sell the Adair frac plug under the KLX brand name in the United States and Canada.  The plug that was originally manufactured by Mag Machine is specifically identified in the Distribution Agreement, and a rendering of its design is attached to the contract.

21.     The Distribution Agreement prohibits Mag Machine from divulging or otherwise using KLX's confidential and proprietary information without consent.

22.     In Article 13 of the Distribution Agreement, entitled "Confidentiality," Mag Machine promised it would not divulge or retain any such information during the term of the agreement and for a period of five years thereafter.  Specifically, Mag Machine promised that:

> During the course of [Mag Machine] providing Products to [KLX] for [its] promotion and sale of such Products . . . the Parties hereby recognize that each may be exposed to unpublished items of technical or nontechnical information

---

[1] In November 2018, KLX consented to Mag Machine's assignment of the Distributor Agreement to its wholly-owned subsidiary of the same name, on the express understanding that, "[p]er Article 18(c) of the Agreement . . . no such assignment shall relieve the assigning party of any of its obligations under the Agreement."  *See* **Exhibit 2**.

including, but not limited to, materials, equipment, **designs, specifications, know-how, product uses, processes, blueprints, formulae, costs, financial data, marketing plans and direct selling systems, customer lists and technical and commercial information** relating to customers or business projections used by either Party in its business, and any other documents or information that either Party considers to be trade secrets or confidential information (collectively, "Proprietary Information"), whether or not the subject of any patent or patent application, constitute valuable trade secrets or confidential information and are the exclusive property of the Party disclosing such information. Consequently, during the Term of this Agreement . . . and for a period of five (5) years thereafter, neither Party shall disclose to any unauthorized person or use in any unauthorized manner the Proprietary Information, and each Party specifically further agrees:

(i) **not to, directly or indirectly, disclose or make available to anyone not employed by or affiliated with such Party, or use outside of such Party's organization, any Proprietary Information for any reason or purpose whatsoever** unless such persons: (1) have been duly informed of the obligations of confidentiality associated with the Proprietary Information; (2) expressly agree, in writing, to comply with the obligations of confidentiality associated with such Proprietary Information, such obligations being as least as restrictive as the obligations set forth in this Agreement; and (3) have an express need to know such information in order to accomplish the Purpose.

*Id*. § 13(a) (emphases added).

## II.   KLX Implements Numerous Design Improvements & Shares Confidential Customer Information with Mag Machine

23.     In the months following the execution of the Distribution Agreement, KLX conveyed streams of confidential information to Mag Machine based on its own testing and customer feedback, which led to numerous design improvements to the original Adair plug.

24.    Because dissolvable frac plugs are relatively new to the oil and gas market, KLX made various changes to optimize the product and to address performance issues reported by its customers following the plug's initial rollout.  As described further below, these iterational design changes were developed by KLX engineers following in-house testing and analysis at KLX's engineering facilities.

25.    The dissolvable frac plugs that were eventually sold under the KLX brand name (the "KLX Plug") incorporated these KLX-driven design modifications.  These improvements were not previously known to Mag Machine and would not have been implemented but for KLX's instructions and provision of Proprietary Information to Mag Machine.

A.    <u>Seal Ring Enhancements</u>

26.    Beginning in May 2018, KLX introduced the KLX Dissolvable Frac Plug on a trial basis in substantially the same form as originally designed by Mag Machine. KLX sold a limited number of those plugs from May 2018 through September 2018 before commencing the full commercial release of the product line in October 2018.

27.    Soon after the commercial release, several KLX customers began reporting pressure anomalies that were potentially attributable to failures in the plugs.  In response to these reports, in February 2019, KLX conducted its own plug testing and troubleshooting at the KLX engineering facilities in Powell, Wyoming.

28.    During this testing process, KLX discovered a flaw in the design and material composition of the original Adair plug's seal ring.  Specifically, KLX engineers

observed that the existing seal ring had the tendency to separate during plug-setting sequencing, which then prevented the plugs from maintaining pressure isolation.

29.     To solve this problem, KLX engineers implemented several design improvements.   First, KLX instructed Mag Machine to use a new "high elongation material" for the seal rings, then worked with Mag Machine and its supplier to begin utilizing material with higher elongation properties that greatly improved the effectiveness of the expansion seal.

30.     KLX also implemented a "Seal Sacrificial Ring Design" to mitigate the risk of tearing the seal rings.  Specifically, KLX instructed Mag Machine to implement a new expansion ring between the seal ring and the slip body to act as a bearing and to help absorb any damage to the seal.  KLX engineers described these design changes to Mag Machine over the telephone and in email correspondence.   Mag Machine then implemented these design changes based on the information provided by KLX, which greatly enhanced the performance of the plugs.

   B. <u>Development of the Rapid Alloy Material</u>

31.     In June 2019, KLX made another material design change to the plugs by commercializing a plug made from a new "rapid" dissolving alloy that would allow the plug to dissolve more quickly in freshwater environments.

32.     The original Adair plug was comprised of a "standard" magnesium alloy, which requires the presence of salinity or chlorides for dissolution.  In its discussions with its customers, KLX identified a market need for a dissolvable plug that performed equally well in freshwater applications.  At KLX's instruction, Mag Machine identified

and presented a viable option for a rapid dissolvable alloy.  Mag Machine conducted its own quality testing and informed KLX that the product performed over a range of casing weights.  KLX began selling the new "rapid alloy" plugs to its customers in or around June 2019.

33.     Soon thereafter, KLX customers began reporting failures of the rapid alloy plugs.  For example, in September 2019, two KLX customers reported catastrophic failures of the plugs and terminated their relationship with KLX.

34.     In response to these reports from its customers, KLX began conducting in-house testing and troubleshooting of the rapid alloy plugs at its engineering facilities.

35.     As a result of this testing, KLX discovered the rapid alloy plugs only performed when set in a specific casing weight and were not in fact not suitable for a "range of casing weights" as previously certified by Mag Machine.  KLX engineers recorded their findings in a written investigation report in October 2019 and conveyed their findings to Mag Machine.

36.     To solve this problem, KLX engineers instructed Mag Machine to incorporate a new "locking feature" into the design of the rapid alloy plugs that would permit the plug to perform across a range of casing weights.  At KLX's direction, Mag Machine implemented this new locking design feature into the product, which greatly improved the performance of the plugs.

C.     Additional Design Modifications by KLX

37.     In addition to the design modifications described above, KLX made additional changes to the plug to improve its performance.

38.    For example, through their own testing, KLX engineers identified a performance issue arising from premature fracturing of the plug slips (the portion of the plug designed to anchor it to the surrounding casing).  To address this problem, KLX engineers increased the back-angle of the ceramic buttons on the slip.  Based on proprietary and confidential information developed by from KLX shared with Mag Machine, other modifications were implemented to the improve the slip design, including increasing the number of segments composing the slip to help distribute the load in a better radial fashion (thus reducing excess radial stress) and modifying the placement of the buttons to help improve penetration and friction with the casing.

39.    KLX engineers also instructed Mag Machine to decrease the size of the "guide shoe" on the plug, for the purpose of decreasing dissolution times on the portions of the plug that are not critical to its function.  The originally designed plug had a larger guide shoe that was functionally unnecessary, and which caused slower dissolution rates. KLX engineers further modified the guide shoe by directing Mag Machine to machine a series of bypass holes to further decrease mass and expedite the dissolution process.

40.    None of the design changes described above would have been possible, nor would they have been made by Mag Machine, but for the confidential information and feedback from KLX's customers that KLX provided to Mag Machine.

D.    KLX Shares Other Confidential Customer Information with Mag Machine

41.    To ensure the KLX Plugs perform properly for its E&P customers, KLX routinely must test the plugs' dissolution rates in the fluids at its various customers'

wells, the composition of which differs based on geographic and other factors. Mag Machine performed dissolution testing on the KLX Plugs at its facility in Oklahoma.

42.     To facilitate the testing process, KLX regularly provided Mag Machine with information and fluid samples from its various KLX customers that have purchased its plugs or expressed interest in purchasing plugs. Specifically, KLX would have its customers send fluid samples directly to Mag Machine at its testing facility in Oklahoma. These samples were each accompanied by a form that identified the customer's name, geographic region, and specific well information. Mag Machine would then test various plug alloys in the customer's fluid sample to determine their dissolution rates.

43.     This confidential information provided to Mag Machine identifies every potential or current KLX customer that KLX has performed dissolution tests for, and provides specific well information and plug test results associated with each customer.

44.     Additionally, KLX's customers regularly performed their own testing of the frac plugs in the field and reported technical measures of the plugs' performance to KLX. In turn, KLX regularly forwarded this information to Mag Machine for the purpose of troubleshooting specific performance issues or confirming the quality of the plugs' performance for specifically identified customers.

45.     By 2020, KLX had sold the improved plugs to dozens of customers, all of which were identified to Mag Machine in the course of its performance under the Distribution Agreement.

### III.   Mag Machine, through Cornerstone, Begins Selling KLX-Designed Plugs to KLX Customers

46.     On July 15, 2020, at what has been to date the low point of oilfield activity within the COVID 19 pandemic, Mag Machine sent KLX a letter asserting that KLX had failed to comply with certain minimum purchase obligations under the Distribution Agreement for the second quarter of 2020.   Nonetheless, the letter stated that Mag Machine's "desire is to continue working with and selling the dissolvable plug to KLX. We currently are not marketing this product to other customers as described in the agreement."

47.     Mag Machine reemphasized the same message in its transmittal email, stating "Please be assured we are still keeping the Adair dissolving plug for KLX.   We are not marketing this plug to other customers.   We value our relationship with KLX and want to continue to grow it."

48.     In written communications and telephone calls from July through September 2020, Mag Machine continued to confirm that it would maintain exclusivity as outlined in the contract and would not sell the KLX Plug to anyone but KLX.

49.     These statements were untrue.   In reality, Mag Machine had already begun to exploit KLX's confidential information to cut KLX out of the mix and steal its customers.

50.     On July 10, 2020, the two principals at Mag Machine created a new entity called Cornerstone Tools, LLC.

51.     In October 2020, KLX learned that Mag Machine was using Cornerstone Tools to directly or indirectly sell the KLX Plugs to KLX's own customers.  That month, one of KLX's existing frac plug customers stopped purchasing plugs from KLX and instead began purchasing plugs from a third-party reseller named Jet Oilfield Services. KLX's customer reported that the plugs it purchased from Jet Oilfield Services were identical to the KLX Plug and contained all the above-referenced KLX design modifications.

52.     The plugs at issue were shipped to KLX's customer in a box indicating they were manufactured by "Cornerstone Tools."  Below is a picture of the plug box sent to KLX by its customer:



53.     Additionally, the sales representative selling the plug told KLX's customer that the plug was the "same" as the KLX plug and that Cornerstone Tools was KLX's manufacturer.

54.     When asked by KLX, Mag Machine acknowledged selling plugs through Cornerstone, but it claimed that the plugs sold were different from the KLX Plugs.

55.     Jet Oilfield Services would not have known the identity of KLX's customers, nor would it have known any details regarding the types of frac plugs KLX sold to its customers, if this confidential information had not been provided to it by Mag Machine and Cornerstone.

56.     Since October 2020, at least two other KLX customers have been approached to purchase the "Cornerstone" plugs made by Mag Machine.  Defendants are purposefully targeting KLX customers and purporting to offer them the "same" KLX plug but at a lower price.  Defendants have also told numerous KLX customers, either directly or through Jet Oilfield Services, that KLX was changing manufacturers and would no longer be selling the same plug.

57.     Based on the fact that (1) at least one KLX customer has begun purchasing its plugs from an entity associated with Defendants, and (2) those plugs contained KLX's confidential and material design enhancements, it is now evident that Defendants have been secretly using KLX's confidential information and trade secrets in a manner that has already harmed and/or will continue to cause imminent harm to KLX.

## **COUNT ONE:  BREACH OF CONTRACT (MAG MACHINE)**

58.     Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

59.     On July 12, 2018, KLX and Mag Machine entered the Distribution Agreement, which is a valid, enforceable contract.

60.     In the Distribution Agreement, Mag Machine acknowledged that, in manufacturing products for KLX, it "may be exposed to unpublished items of technical or nontechnical information including, but not limited to, materials, equipment, designs, specifications, know-how, product uses, processes, blueprints, formulae, costs, financial data, marketing plans and direct selling systems, customer lists and technical and commercial information relating to customers or business projections used by [KLX] in its business," as well as other trade secrets or confidential information (collectively, "KLX Proprietary Information").

61.     Mag Machine promised that, during the term of the agreement, and for a period of five years thereafter, it would not disclose to any unauthorized person or use in any unauthorized manner the Proprietary Information."   Ex. 1 § 13(a).   Mag Machine further promised that it would not directly or indirectly, "disclose or make available to anyone . . . or use outside of [KLX's] organization, any Proprietary Information for any reason or purpose whatsoever" without first obtaining KLX's written consent.  *Id.*

62.     KLX provided Mag Machine with access to KLX Proprietary Information, including but not limited to unpublished design specifications, testing data, customer lists, and technical information pertaining to its customers' use of the KLX Plugs.  The KLX Plugs themselves incorporate and are derived from KLX's Proprietary Information.

63.     Mag Machine materially breached this contractual obligation when it used KLX's Proprietary Information, without consent, to market and sell dissolvable frac plugs to KLX's own customers.   Specifically, Mag Machine has conveyed KLX's

Proprietary Information to Cornerstone, Jet Oilfield Services, and other third parties for the purpose of stealing business from KLX.

64.     Mag Machine has continued to materially breach this obligation by utilizing KLX's Proprietary Information to directly or indirectly market and sell dissolvable frac plugs to KLX's own customers.

65.     On information and belief, Mag Machine has also breached other representations and warranties in the Distribution Agreement, including: (1) the representation that it "exclusively and solely own[ed]" the "Adair" plug identified in the Distribution Agreement; and (2) its obligation to refrain from selling the plug to third parties during the Distribution Agreement's exclusivity period.

66.     As a direct and proximate result of Mag Machine' breaches of the Distribution Agreement, KLX has suffered and will continue to suffer damages, and has been forced to incur attorneys' fees and costs.

67.     KLX seeks to recover its damages and to enforce the covenants set forth in the Distribution Agreement and to enjoin Mag Machine, for a period of five years, from directly or indirectly marketing or selling dissolvable frac plugs to KLX's customers whose identities were made known to Mag Machine by virtue of its performance of the Distribution Agreement.

68.     All conditions precedent to the institution of this action have occurred or have been waived.

## COUNT TWO:  TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (BOTH DEFENDANTS)

69.     Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

70.     Mag Machine only knew the identity of KLX's customers because KLX provided that information in connection with Mag Machine's testing and manufacture of the KLX Plugs.  KLX also provided Mag Machine with confidential information pertaining to the performance of various plug designs for specific KLX customers.

71.     All of this information was confidential and Proprietary Information as defined by the Distribution Agreement, and was only provided to Mag Machine by virtue of its performance under the Distribution Agreement.

72.     Mag Machine disclosed KLX's Proprietary Information to Cornerstone and others without KLX's consent.

73.     Mag Machine and Cornerstone engaged in the knowing and tortious interference between KLX and its customer relationships by, among other things, soliciting, inducing, recruiting, facilitating, and encouraging the sale of dissolvable frac plugs to KLX's customers, thereby causing KLX's customers to cease doing business with KLX.

74.     Upon information and belief, Mag Machine and Cornerstone either facilitated, encouraged, participated in, or ratified by their action or inaction the misuse of KLX Proprietary Information.  Mag Machine and Cornerstone benefitted from their

retention and continued use of KLX Proprietary Information by marketing and selling dissolvable frac plugs to KLX customers, to the detriment of KLX.

75.     Such interference was malicious in that it was done with the specific intent to cause substantial injury to KLX and involved an extreme degree of risk to KLX, of which Defendants were aware and consciously ignored.

76.     Such interference was also done using improper conduct or means, including because Defendants were aware that using KLX's Proprietary Information for the purpose of selling KLX-designed products to KLX customers was a violation of Mag Machine's obligations under the Distribution Agreement and a misuse of KLX trade secrets.

77.     As a proximate result of Defendants' tortious interference, KLX has suffered damages to its business for which it now seeks recovery.  KLX further seeks exemplary damages, court costs, and pre- and post-judgment interest.  Furthermore, KLX seeks injunctive relief ordering enjoining Mag Machine and Cornerstone from tortiously interfering with KLX's business relations with its customers and ordering Defendants to cease, for a period of five years, directly or indirectly marketing or selling dissolvable frac plugs to KLX's customers whose identities were made known to Mag Machine by virtue of its performance of the Distribution Agreement.

## COUNT THREE:  MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT 18 U.S.C. § 1836, *et seq*.
### (BOTH DEFENDANTS)

78.     Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

79.     Defendants have violated the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, by misappropriating technical, financial, marketing and strategic information related to KLX's business, including engineering reports, customer lists, testing data, designs, product plans, performance indicators, and other data provided by KLX in connection with the development, manufacture, and sale of the KLX Plugs (referred to within this section as the "KLX Trade Secrets").

80.     The KLX Trade Secrets relate to products used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

81.     The KLX Trade Secrets are not generally known to the public or generally known in the drilling industry, and their value is derived from the fact that they are kept secret.

82.     Some of the KLX Trade Secrets are a compilation of information that standing alone might not be a trade secret, but in the aggregate, constitute a protectable trade secret.

83.     KLX takes reasonable efforts to maintain the secrecy of the KLX Trade Secrets.   These efforts include, but are not limited to: (a) by requiring its vendors, including Mag Machine, to sign agreements in which they promise not to retain, disclose, or otherwise use KLX Trade Secrets without KLX's express consent; (b) physical security measures such as door locks and electronic access mechanisms; (c) password protection to access KLX's network systems containing the KLX Trade Secrets; and (d) requiring key KLX employees to sign agreements in which they promise to hold in strict

confidence, and not disclose, use, or retain any KLX trade secrets outside of their employment with KLX.

84.     KLX has kept the KLX Trade Secrets confidential and has not disclosed them outside of KLX except under non-disclosure agreements with third parties that would safeguard the secrecy of the information.

85.     KLX derives economic value, actual and potential, from the KLX Trade Secrets not being generally known to persons who could obtain economic value from their use.

86.     The KLX Trade Secrets would be economically valuable in the hands of KLX's competitors, who could use the KLX Trade Secrets to improve their products or services to compete with KLX.  The KLX Trade Secrets could give a competitor valuable information about the design of KLX's products; they could provide a shortcut to enable a competitor to manufacture competing products more effectively and efficiently; they would provide information to a competitor about KLX's strategic plans so as to adjust the competitor's own strategic planning for the purpose of frustrating KLX's goals; and they could provide valuable information about development or operational steps that were not successful so as to avoid those steps in the competitor's own development or operations. The KLX Trade Secrets would also provide a competitor with KLX's various pricing information, the identity of its customers, vendors, and suppliers, and historical performance data of KLX's products, among other information.

87.     Defendants were under multiple duties to keep the KLX Trade Secrets confidential and to not disclose or use this information without KLX's consent, including

under the Distribution Agreement wherein Mag Machine agreed to keep KLX's information confidential. Defendant Cornerstone was aware of Mag Machine's contractual obligations to keep the KLX Trade Secrets confidential.

88.     Despite these obligations and promises, upon information and belief, on one or more occasions, Mag Machine and Cornerstone disclosed and/or used the KLX Trade Secrets without KLX's consent. In so doing, Defendants acquired the KLX Trade Secrets by improper means.

89.     Defendants have continued to misappropriate KLX Trade Secrets by maintaining possession of such information, directly or indirectly transferring it to third parties, and by utilizing KLX Trade Secrets to manufacture competing products and to sell those products to KLX customers.

90.     Upon information and belief, Mag Machine and Cornerstone have used and continue to use the misappropriated KLX Trade Secrets for various unlawful purposes without consent, including to manufacture competing products and soliciting, directly or indirectly, KLX customers.

91.     As a direct and proximate result of Defendants' conduct, KLX has suffered damages in an amount to be determined at trial.

92.     Defendants willfully and maliciously misappropriated the KLX Trade Secrets with the deliberate attempt to injure KLX's business and improve their own economic standing, thereby entitling KLX to an award of exemplary damages and/or attorneys' fees.

93.     Defendants' wrongful conduct in misappropriating the KLX Trade Secrets has caused and will cause KLX great and irreparable harm, for which it has no adequate remedy at law.

94.     Defendants' intentional misuse and unauthorized retention of KLX Trade Secrets demonstrates that they will continue to use and disclose KLX Trade Secrets unless enjoined.

95.     Based on the foregoing, KLX prays that preliminary and permanent injunctions be issued ordering that Defendants and their representatives, agents, designees, and any third parties acting in concert with them be restrained from direct or indirectly:

> a.  Marketing or selling dissolvable frac plugs to KLX's customers whose identities were made known to Mag Machine by virtue of its performance of the Distribution Agreement; and

> b.  Otherwise obtaining, accessing, using, possessing, retaining, transmitting, copying, or disclosing any of KLX's confidential, proprietary, or trade secret information.

## COUNT FOUR:  MISAPPROPRIATION OF CONFIDENTIAL BUSINESS INFORMATION (BOTH DEFENDANTS)

96.     Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

97.     The data and information encompassed by the KLX Trade Secrets also constitute confidential business information under Oklahoma common law.

98.     In the manner above alleged, Defendants misappropriated this confidential business information for the purpose of wrongfully competing with KLX.

99.     As a direct and proximate result of Defendants' misappropriation of KLX's confidential business information, KLX has suffered damages in an amount to be determined at trial.

100.    Defendants willfully and maliciously misappropriated KLX's confidential business information with the deliberate attempt to injure KLX's business and improve their own economic standing, thereby entitling KLX to an award of punitive damages.

## COUNT FIVE:  DECEPTIVE TRADE PRACTICES (78 OKLA. STAT. § 78-53) (DEFENDANT CORNERSTONE)

101.    Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

102.    A person engages in deceptive trade practices when in the course of busines, the person, among other things: (1) knowingly makes a false representation as to the source, sponsorship, approval, or certification of goods or services; or (2) knowingly makes a false representation as to affiliation, connection, association with, or certification by another.

103.    Defendant Cornerstone engaged in deceptive trade practices when it represented to KLX customers and other third parties that it was the manufacturer of the KLX plug and that its plug was "the same" as the KLX plug.

104.    Those statements were false because Cornerstone did not manufacture any frac plugs for KLX, and KLX never approved or certified any Cornerstone plug or authorized Cornerstone to indicate that it had any affiliation with KLX.

105.    Cornerstone made these false statements knowingly and with the intent to injure competition and to destroy or substantially lessen competition.

106.    Cornerstone's deceptive practices caused injury to KLX, including but not limited to the loss of customers and sales that would have otherwise accrued to KLX but for Cornerstone's deceptive conduct.

## COUNT SIX:  UNJUST ENRICHMENT (BOTH DEFENDANTS)

107.    Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

108.    At all times relevant to this litigation, Defendants owed KLX a legal duty to not unfairly or unduly take advantage of KLX or commit wrongful acts in order to unjustly enrich themselves at KLX's expense.

109.    Defendants violated this duty by unjustly enriching themselves by using KLX Proprietary information, including its testing results, design modifications, and customer lists, to sell products to KLX customers to the detriment of KLX.

110.    Defendants have unjustly obtained an economic benefit as a direct and proximate result of their misconduct described above.

111.    KLX seeks a constructive trust as to any and all profits, compensation, or financial gain of any kind that Defendants have received and continue to receive as a result of their breaches.

## JURY DEMAND

112.    Plaintiff hereby demands a jury trial under Federal Rule of Civil Procedure 38(b).

## <u>CONCLUSION AND PRAYER</u>

For the foregoing reasons, KLX respectfully requests that judgment be entered in its favor and against Defendants, in addition to the following relief:

1.  Preliminary and permanent injunctions enjoining Defendants from directly or indirectly:

    a.  Marketing or selling dissolvable frac plugs to any KLX customer whose identity was made known to Mag Machine by virtue of its performance of the Distribution Agreement; and

    b.  Obtaining, accessing, using, possessing, retaining, transmitting, copying, or disclosing any of KLX's confidential, proprietary, or trade secret information.

2.  Compensatory damages, actual damages, incidental and consequential damages, lost profits, unjust enrichment, restitution, and/or reasonable royalties in an amount to be shown at trial, and a finding that Defendants are liable for each of the foregoing;

3.  Exemplary damages of twice the amount awarded as general damages for the statutory causes of action based on misappropriation of trade secrets;

4.  Exemplary damages as otherwise allowed by law;

5.  KLX's attorneys' fees and costs as allowed under the DTSA or any other applicable statutory or common law provision;

6.  Pre- and post-judgment interest and costs of suit incurred herein; and

7.  Any other and further relief that the Court may deem just and proper.

Respectfully Submitted,

_/s/ David P. Whittlesey_

David P. Whittlesey*
Texas Bar No. 00791920
*_pro hac vice_
SHEARMAN & STERLING LLP
300 West 6th Street, Suite 2250
Austin, TX 78701
(512) 647-1900
david.whittlesey@shearman.com

  –and–

Reagan E. Bradford, OBA #22072
Ryan K. Wilson, OBA #33306
BRADFORD & WILSON PLLC
431 W. Main Street, Suite D
Oklahoma City, OK 73102
(405) 698-2770
(405) 234-5506 fax
reagan@bradwil.com
ryan@bradwil.com

**ATTORNEYS FOR PLAINTIFF**
**KLX ENERGY SERVICES LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 25, 2021, a true and correct copy of the above and foregoing document was served in accordance with the Local Rules on all counsel of record *via* the Court's electronic filing system, including the following:

Daniel V. Carsey, OBA No. 21490
Jacqueline M. McCormick, OBA No. 31640
HALL, ESTILL, HARDWICK, GABLE,
GOLDEN & NELSON, P.C.
100 North Broadway, Suite 2900
Oklahoma City, OK 73102-8865
Telephone: (405) 553-2313
Facsimile: (405) 553-2855
dcarsey@hallestill.com
jmccormick@hallestill.com

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF,
MAGNESIUM MACHINE, LLC**

*/s/ David P. Whittlesey*
David Whittlesey